UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------

RAOFA NUSRATY,

                        Plaintiff,

         v.

CAROLYN W. COLVIN,
*Acting Commissioner of Social Security*,

                     Defendant.

-------------------------------------------------------------

**MEMORANDUM & ORDER**
15-CV-2018 (MKB)

MARGO K. BRODIE, United States District Judge:

       Plaintiff Raofa Nusraty commenced the above-captioned action pursuant to 42 U.S.C.

§ 405(g) seeking review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying her claim for disability insurance benefits.  The Commissioner moves

for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

arguing that the decision by Administrative Law Judge April Wexler (the "ALJ") is supported by

substantial evidence and should be affirmed.  (Comm'r Mot. for J. on the Pleadings ("Comm'r

Mot."), Docket Entry No. 12; Comm'r Mem. of Law in Supp. of Comm'r Mot. ("Comm'r

Mem."), Docket Entry No. 13.)  Plaintiff cross-moves for judgment on the pleadings, claiming

that the ALJ's decision is not supported by substantial evidence because (1) the ALJ improperly

discounted the opinion of Plaintiff's treating physician, (2) the ALJ improperly assessed

Plaintiff's credibility, and (3) the ALJ improperly determined that Plaintiff could perform her

past work.  (Pl. Cross-Mot. for J. on Pleadings ("Pl. Mot."), Docket Entry No. 15; Pl. Mem. in

Supp. of Pl. Mot. ("Pl. Mem."), Docket Entry No. 16.)  For the reasons set forth below, the

Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.

## I. Background

Plaintiff was born in 1957 and completed high school in 1976. (R. 191, 195.) From January of 1982 to September of 2012, Plaintiff worked as a jewelry designer. (R. 195.) On September 22, 2012, Plaintiff applied for disability insurance benefits, alleging that she was disabled as of January 1, 1995 due to "heart problems" and "knee problems." (R. 86, 103, 194.) Plaintiff's application was denied. (R. 113–16.) Plaintiff requested a hearing before the ALJ, which was held on December 23, 2013. (R. 28–85.) At the hearing, Plaintiff amended her claim to request an alleged disability onset date of September 22, 2012. (R. 80.) By decision dated February 18, 2014, the ALJ found that Plaintiff was not disabled and denied Plaintiff's application. (R. 12–23.) On February 5, 2015, the Appeals Council denied review of the ALJ's decision. (R. 1–4.)

### a. Plaintiff's testimony

Plaintiff lives with her husband, and together with her husband, worked for the same family-run jewelry business. (R. 33–34.) Plaintiff began working for the jewelry business on a part-time basis in 1982. (R. 32–33.) She designed and sold jewelry and embroidery. (R. 60–61.) When her physical impairments prevented her from commuting to the jewelry store, Plaintiff would design jewelry from her home. (R. 61.)

Plaintiff was unable to work more than fifteen hours per week because of arthritis, knee pain, asthma and heart problems. (R. 50, 72.) Plaintiff has had a mechanical valve and a pacemaker implanted to treat her heart problems. (R. 51.) Plaintiff's heart problems required her to take Coumadin and to visit her doctor every two or three days to have the iron levels in her blood checked. (R. 52–55.) Plaintiff's doctor prescribed morphine to treat her arthritis and knee

pain, and administered injections in her knees every six months, which injections sometimes temporarily alleviated Plaintiff's knee pain. (R. 51–52.) Plaintiff treated her asthma with an inhaler. (R. 56.) Plaintiff also had anemia caused by stomach bleeding. (R. 54.)

Plaintiff could not lift more than two-to-three pounds and could not bend her left knee. (R. 66.) When climbing stairs, Plaintiff had trouble breathing and felt knee pain. (R. 73.) Plaintiff was able to drive, but her back pain sometimes prevented her from doing so. (R. 33.) When Plaintiff could not drive, her husband or daughter-in-law drove her to work. (R. 67.) Plaintiff's daughter often drove Plaintiff to her doctor's appointments and sometimes brought food to Plaintiff. (R. 63–64.) When her daughter could not bring her food, Plaintiff prepared her own meals, but it was difficult for her to do so. (R. 64.) Plaintiff's husband and daughter performed the household chores. (R. 64–65.) Plaintiff shopped for groceries with her husband, but her husband carried the bags. (R. 65.)

### b. Medical evidence

#### i. Dr. Aaron Freilich

On October 31, 2006, Plaintiff saw cardiologist Dr. Aaron Freilich, M.D., for a cardiac evaluation. (R. 286.) Dr. Freilich noted that Plaintiff had rheumatic heart disease and hypertension, that Plaintiff underwent mitral valve replacement in 1995, and that Plaintiff's ambulation was limited due to diffuse arthritic pain. (R. 286.) Dr. Freilich diagnosed Plaintiff with mitral valve regurgitation, atrial fibrillation, hypertension, insomnia and aortic stenosis. (R. 287.) He concluded that Plaintiff would "almost definitely" require aortic valve surgery and was at "high risk" of requiring a pacemaker. (R. 287.)

On November 17, 2006, Plaintiff visited Dr. Freilich and complained of dizziness, weakness and fatigue. (R. 284.) Plaintiff's pulse was irregular, and she needed a pacemaker because her heart rate was "less than 30." (R. 284.) Dr. Freilich diagnosed Plaintiff with

moderate aortic stenosis and regurgitation.  (R. 284.)  He noted that this condition would require serial monitoring with echocardiograms.  (R. 284.)

On February 5, 2007, Plaintiff visited Dr. Freilich.  (R. 283.)  He noted that a pacemaker had been implanted in Plaintiff.  (R. 283.)  Plaintiff continued seeing Dr. Freilich for follow-up visits from June of 2007 to September of 2012, during which time Dr. Freilich did not note any changes to Plaintiff's condition.  (R. 261–82.)

On June 14, 2013, Plaintiff returned to Dr. Freilich for a follow-up visit to evaluate her pacemaker and mitral valve replacement.  (R. 445.)  Dr. Freilich noted that Plaintiff had a "high risk" of thromboembolism and diagnosed Plaintiff with hypertension, carotid stenosis, aortic insufficiency, atrial fibrillation and status post-mitral valve replacement.  (R. 445.)

### ii.  Dr. Eric Blacher

On September 7, 2012, Dr. Eric Blacher, M.D., a primary care physician, examined Plaintiff.  (R. 325.)  Plaintiff complained of trouble sleeping, of pain in both knees and of muscle aches.  (R. 323.)  Dr. Blacher noted that Plaintiff had undergone a mitral valve replacement and suffered from myalgia and myositis, insomnia, atrial fibrillation and hypertension.  (R. 324–25.)  Dr. Blacher prescribed Zolpidem to treat Plaintiff's insomnia and advised Plaintiff to follow up with her cardiologist and to return for another physical examination in three months.  (R. 324.)

On October 8, 2012, Plaintiff had a follow-up visit with Dr. Blacher.  (R. 310–14.)  Plaintiff complained of chronic knee pain and side effects from her sleeping medication, which made her feel drowsy.  (R. 310.)  Dr. Blacher diagnosed Plaintiff with knee joint pain, hypertension, cellulitis and osteoarthritis of the knee.  (R. 311–12.)  Dr. Blacher noted that Plaintiff's hypertension was high and ordered an x-ray of Plaintiff's knees.  (R. 311, 313.)

In a note dated October 10, 2012, and addressed "to whom it may concern," Dr. Blacher wrote that Plaintiff suffered from atrial fibrillation, mitral regurgitation, sick sinus syndrome,

pacemaker, hypertension, macular degeneration, diverticulitis, osteoarthritis of the knee and anxiety. (R. 643.) Dr. Blacher noted that because a lack of medical care could be "significantly detrimental" to Plaintiff's health, it was "imperative that there be no interruption" to her medical coverage. (R. 643.)

On October 24, 2012, Plaintiff visited Dr. Blacher, and he diagnosed her with knee joint pain, osteoarthritis of the knee and hypertension. (R. 306–09.) Dr. Blacher noted that Plaintiff's hypertension had improved and that surgery might be required to treat her osteoarthritis. (R. 309.)

On December 18, 2012, Plaintiff visited Dr. Blacher and complained of a headache, cough and difficulty sleeping. (R. 414.) On examination, Dr. Blacher noted abnormal breathing sounds and an occasional wheeze on Plaintiff's right side. (R. 417.) Dr. Blacher diagnosed Plaintiff with a cough, acute bronchitis, asthma and asthmatic bronchitis. (R. 414.) He prescribed amoxicillin, hycodan and a Proventil inhaler. (R. 415.)

On December 28, 2012, Plaintiff visited Dr. Blacher for a health maintenance exam. (R. 408–13.) Plaintiff felt well and had no acute issues. (R. 408.) Dr. Blacher diagnosed Plaintiff with knee joint pain, sick sinus syndrome, hypertension and osteoarthritis of the knee. (R. 409–10.) Dr. Blacher noted that Plaintiff's hypertension was controlled and advised Plaintiff to lose weight. (R. 410.)

On May 21, 2013, Plaintiff visited Dr. Blacher and complained of worsening bilateral lower extremity pain. (R. 458.) Dr. Blacher diagnosed Plaintiff with anemia, hypertension, and foot pain (soft tissue). (R. 458.) Dr. Blacher noted that Plaintiff's hypertension was high and that the pain in Plaintiff's feet was likely arthritic. (R. 462.)

On July 8, 2013, Plaintiff visited with Dr. Blacher and complained of headaches, lower back pain that radiated down her legs, and chronic knee pain. (R. 438–42). Dr. Blacher diagnosed Plaintiff with knee joint pain, osteoarthritis of the knee, backache, headache, sciatic radiculopathy, hypertension and atrial fibrillation. (R. 438.) Dr. Blacher noted that Plaintiff's headaches were likely caused by tension, her knee pain was caused by her "significant" arthritis, and her hypertension remained high. (R. 439.) Dr. Blacher increased Plaintiff's prescription Losartan, which treated her hypertension, and ordered an x-ray of Plaintiff's back to assess her "backache with sciatica." (R. 439.)

On August 5, 2013, Plaintiff had a follow-up visit with Dr. Blacher. (R. 424.) Dr. Blacher diagnosed Plaintiff with hypertension and diverticulosis. (R. 424.) Dr. Blacher noted that Plaintiff's hypertension was not controlled and changed her medication to Diovan. (R. 424–25.)

On October 15, 2013, Dr. Blacher assessed Plaintiff's residual functional capacities ("RFC"). (R. 401–03.) Dr. Blacher noted that he had regularly treated Plaintiff for chronic arthritis since October 31, 2011, that Plaintiff's arthritis caused her back pain, knee pain and sciatica radiating to her left leg, and that her medication made her drowsy. (R. 401, 403.) Dr. Blacher rated the extent of Plaintiff's functional limitations. (R. 401–02.) He concluded that Plaintiff could walk only one block before having to rest, could sit for fifteen minutes at one time and stand for ten minutes at one time; that Plaintiff could stand for a total of one hour during an eight-hour workday, would require a job that permitted her to shift positions from sitting, standing or walking, and would need to take unscheduled, fifteen-minute breaks every hour; and that Plaintiff could not lift any amount of weight. (R. 401–02.)

As a result of Plaintiff's impairments, Dr. Blacher determined that Plaintiff would be absent from work more than four times per month. (R. 402.) Dr. Blacher found that Plaintiff's impairments would frequently interfere with the ability to complete simple work-related tasks. (R. 401.) Dr. Blacher concluded that Plaintiff was not physically capable of working forty hours per week. (R. 402.) Dr. Blacher noted that Plaintiff was not a malingerer and that her impairments were reasonably consistent with her symptoms and the functional limitations that he noted. (R. 402.)

### iii.  Dr. Anang Modi

On January 22, 2013, Dr. Anang Modi, a doctor of osteopathic medicine, evaluated the osteoarthritis in Plaintiff's knees. (R. 502–06.) Dr. Modi noted that Plaintiff had received Synvisc injections in her knees and that although Plaintiff reported that the injections helped alleviate her knee pain, Plaintiff was again feeling pain and stiffness in her knees. (R. 505.) Dr. Modi diagnosed Plaintiff with generalized osteoarthritis and arthralgias in multiple sites, ordered further Synvisc injections for Plaintiff's knees and noted that he could not prescribe Celebrex because of Plaintiff's heart condition. (R. 503.)

On February 19, 2013, Plaintiff visited Dr. Modi. (R. 497–501.) Plaintiff reported that although the Synvisc injections help alleviate the pain in her knees, the pain had returned, and that she was feeling more subacute pain in her left knee. (R. 499.) Dr. Modi administered injections to each of Plaintiff's knees and ordered Plaintiff to attend physical therapy. (R. 500.)

On August 20, 2013, Plaintiff had a follow-up visit with Dr. Modi. (R. 616–19.) Plaintiff complained of pain, stiffness and gelling in her knees, and reported that although the Synvisc injections helped alleviate her knee pain, the knee pain and stiffness had returned. (R. 618.) On examining Plaintiff, Dr. Modi noted osteoarthritis and tenderness in both knees. (R. 619.) Dr.

Modi diagnosed Plaintiff with knee joint pain and generalized osteoarthritis and ordered Synvisc injections for both knees. (R. 619.)

On September 10, 2013, Plaintiff had a follow-up visit with Dr. Modi. (R. 592–99.) As before, Plaintiff complained of pain, stiffness and gelling in her knees, and reported that although the Synvisc injections helped alleviate her knee pain, the knee pain and stiffness had returned. (R. 598.) Dr. Modi examined Plaintiff and noted osteoarthritis and tenderness in both knees. (R. 599.) Dr. Modi diagnosed Plaintiff with knee joint pain, generalized osteoarthritis and osteoarthritis of the knee. (R. 595.) Dr. Modi noted that Plaintiff's pain medication was not alleviating Plaintiff's pain, and he administered injections to each of Plaintiff's knees. (R. 595–96.) He also prescribed Voltaren gel. (R. 595.)

### iv. Hicksville Physical Therapy

Plaintiff began physical therapy at Hicksville Physical Therapy on March 6, 2013. (R. 488.) Plaintiff complained of knee pain, which pain was worse in her left knee, and swelling in her knees at night. (R. 488.) She reported that she had been administered two Synvisc injections over the prior year but that she still felt pain in both knees. (R. 488.) Plaintiff rated her knee pain as a ten on a scale of one to ten. (R. 488.) On examination of Plaintiff, physical therapist Chandni Suba observed a valgus deformity in Plaintiff's right knee, an antalgic gait, a reduced range of motion in Plaintiff's left knee, and tenderness to palpation, crepitus and swelling in both knees. (R. 488–89.) A McMurray test[1] was positive on Plaintiff's left knee. (R. 489.)

---

[1] A McMurray test involves "rotation of the tibia on the femur" in order to determine whether the meniscus of the knee is injured. *McMurray test*, Stedman's Medical Dictionary (28th ed. 2006).

On multiple dates in March and April of 2013, Plaintiff participated in physical therapy. (R. 470–90.) She complained of knee pain and rated her pain, at its worst, as an eight on a scale of one to ten. (R. 470–90.) At times, Plaintiff reported temporary alleviation of the pain, but she consistently stated that her knees continued to cause her pain and that they were tender. (R. 470, 473, 476, 480, 484, 486.)

### v. Dr. Fawzy Salama

On August 26, 2013, Dr. Fawzy Salama, M.D., a neurologist, saw Plaintiff for a neurology consultation upon referral from Dr. Blacher. (R. 602.) Plaintiff complained of severe lower back pain, which she rated as a nine on a scale of one to ten. (R. 613.) The back pain began three months prior to her visit and was worsening. (R. 613.) Dr. Salama observed that Plaintiff could not fully flex, ambulate or sit with comfort, and that Plaintiff's pain was triggered by lifting, standing straight or changing positions. (R. 613.) Dr. Salama diagnosed Plaintiff with atrial fibrillation, lower limb causalgia, generalized osteoarthritis, lumbago, lumbar spondylosis, anxiety disorder not otherwise specified, knee joint pain, osteoarthritis of the knee, sciatic radiculopathy, primary osteoarthritis of the lumbar vertebrae and chronic pain syndrome. (R. 608–09.)

On November 4, 2013, Plaintiff had a follow-up visit with Dr. Salama. (R. 527–28.) Plaintiff complained of worsening lower back pain and rated the pain as a nine on a scale of one to ten. (R. 527.) Dr. Salama diagnosed Plaintiff with knee joint pain, generalized osteoarthritis and chronic pain syndrome. (R. 529.)

### vi. X-rays

An x-ray of Plaintiff's right knee was performed on October 8, 2012 and revealed significant degenerative changes, joint space narrowing, increased sclerosis and spur formation. (R. 379.) An x-ray of Plaintiff's left knee was performed on January 7, 2013, and revealed

degenerative changes, joint space narrowing and spur formation. (R. 517.) An x-ray of Plaintiff's lumbosacral spine was performed on July 8, 2013, and revealed mild levoscoliosis, degenerative changes at L5–S1, disc narrowing, facet sclerosis, osteophyte production and possible early sacroiliitis. (R. 436–37).

### vii. Consultative examiners, state agency consultants and medical experts

### 1. Dr. Jerome Caiati, consultative medical examiner

On January 9, 2013, Dr. Jerome Caiati, M.D., an internist, conducted a medical examination of Plaintiff at the request of the Social Security Administration. (R. 391–95.)

Plaintiff told Dr. Caiati of her history of hospitalization for mitral valve disease and the pacemaker that was inserted to treat her bradycardia. (R. 391.) Plaintiff also reported that she was taking the following medications: Losartan, Proventil, Coumadin, Zolpidem and Fluticasone nasal spray. (R. 391.) Plaintiff told Dr. Caiati that she was able to cook, clean, do laundry, shop, shower, bathe, dress herself and read. (R. 391.) Dr. Caiati identified Plaintiff's chief complaints as hypertension, asthma, mitral valve disease, bradycardia, bilateral knee pain and left ankle pain. (R. 391.)

Dr. Caiti examined Plaintiff and observed that she was in no acute distress, had a normal gait, could walk on her heels and toes with minimal difficulty, could squat only halfway, had a normal stance, did not use an assistive device, did not need help changing for the examination and was able to rise from her chair without difficulty. (R. 392.) Plaintiff's heart rhythm was regular with a "3/6 systolic murmur and clicking at the aortic and mitral site." (R. 392.) The movements of Plaintiff's cervical spine, lumbar spine, shoulders, elbows, forearms, wrists, hips, right knee and right ankle had a normal range of motion. (R. 392–93.) The range of motion in Plaintiff's left knee and left ankle were limited by pain, and a straight leg raising test was positive on the left side of Plaintiff's body. (R. 393.) Dr. Caiati reviewed an x-ray of Plaintiff's

left knee that was taken that same day, which examination revealed degenerative joint disease. (R. 393, 395.)

Dr. Caiati diagnosed Plaintiff with a history of hypertension, asthma, bilateral knee pain, bradycardia, left ankle pain and mitral valve replacement. (R. 393.) Dr. Caiati concluded that Plaintiff had no restrictions in sitting, reaching, pushing, pulling and bending, and that Plaintiff had a "minimum to mild limitation" in standing, walking, climbing and lifting. (R. 394.)

### 2. Dr. Roy C. Brown, state agency medical consultant

On February 8, 2013, Dr. Roy C. Brown, M.D., a state agency medical consultant, reviewed Plaintiff's medical file and completed an RFC assessment. (R. 87–93.) Dr. Brown's primary diagnosis was osteoarthrosis and his secondary diagnosis was aortic valve disease. (R. 89.) Dr. Brown determined that Plaintiff had multiple exertional limitations: Plaintiff could only occasionally lift or carry twenty pounds, could frequently lift or carry ten pounds, could stand for six hours in an eight-hour workday and could sit for no more than six hours in an eight-hour workday. (R. 91.) Dr. Brown noted postural limitations: Plaintiff could frequently climb stairs or stoop and could occasionally climb ladders, kneel, crouch or crawl. (R. 91–92.) Dr. Brown also noted environmental limitations: Plaintiff needed to avoid concentrated exposure to extreme cold, vibrations, fumes, odors, dusts, gases and poor ventilation. (R. 92.) Dr. Brown did not note any manipulative, visual or communicative limitations. (R. 92.)

### 3. Dr. Michael Falkove, medical expert

On December 4, 2013, Dr. Michael Falkove, M.D., a non-examining medical expert, responded to the ALJ's interrogatories regarding Plaintiff's claim for disability benefits. (R. 639–41.) Dr. Falkove stated that Plaintiff was "stable from a cardiac standpoint" and that Plaintiff had moderate limitations to standing, walking, lifting and carrying. (R. 639.)

Dr. Falkove also stated that Plaintiff could perform sedentary work with "environmental limitations" because of her asthma.  (R. 641.)

### c.  Additional evidence

#### i.  Function report

On December 4, 2012, Plaintiff's daughter completed a function report as part of her application for disability benefits.  (R. 212–23.)  According to the report, Plaintiff lives in a house with her husband.  (R. 212.)  Plaintiff has to be seated when showering or dressing herself.  (R. 213.)  Plaintiff prepares simple meals for herself and her husband once each week, otherwise Plaintiff orders food.  (R. 214.)  Plaintiff is able to do "light cleaning" but otherwise cannot complete household chores like laundry or yard work.  (R. 215.)  Plaintiff is able to drive.  (R. 215.)  Plaintiff takes sleeping pills and pain medication in order to sleep, and she needs reminders to take her medications.  (R. 213–14.)

Plaintiff's heart condition prevents her from lifting anything.  (R. 217.)  Plaintiff's knee pain prevents her from going to the gym or exercising or from standing for more than ten minutes.  (R. 216–17.)  Plaintiff can walk one block before needing to rest.  (R. 219.)  Plaintiff describes her knee pain as a sharp, stabbing pain, which sometimes produces swelling in both legs and radiates to her toes.  (R. 220–21.)  Plaintiff has knee pain all the time, and the pain is increasing and spreading.  (R. 221.)  Plaintiff is receiving Synvisc injections in her knees.  (R. 220–21.)

#### ii.  Vocational expert testimony

Rocco Meola, a vocational expert, testified at Plaintiff's hearing.  (R. 80–85.)  Meola described Plaintiff's past work as a jewelry store manager as light work with a specific vocational preparation ("SVP") of seven, a jewelry sales associate as light work with an SVP of three, and a jewelry designer as sedentary work with an SVP of seven.  (R. 81–82.)  The ALJ

asked Meola to assume a hypothetical individual of the same age and with the same education and work experience as Plaintiff, who is limited to sedentary work and could occasionally lift ten pounds; could sit for approximately six hours and stand or walk for approximately two hours in an eight-hour day with normal breaks; could occasionally climb ramps or stairs but could never climb ladders, ropes or scaffolds; could occasionally balance or stoop; could never kneel, crouch or crawl; could push and pull without limit; and would need to avoid concentrated exposure to dust, odors, fumes. (R. 82–83.) Meola testified that such a person would be able to perform Plaintiff's past work as a jewelry designer. (R. 83.)

### d. The ALJ's decision

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act (the "SSA"). First, the ALJ found that Plaintiff had not engaged in substantial activity since September 22, 2012, the alleged onset date. (R. 17.) Second, the ALJ found that Plaintiff had the following severe impairments: status post-pacemaker and mechanical valve, asthma, knee impairment, degenerative disc disease and hypertension. (R. 17.)

### i. Step three

Third, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or was equal to the severity of any of the impairments listed in Appendix 1 of the Social Security Regulations. (R. 18.) The ALJ considered Listings 1.02, pertaining to a major dysfunction of a joint; 1.04, pertaining to disorders of the spine; 3.03, pertaining to asthma; 4.00(D), pertaining to chronic heart failure; and 4.05, pertaining to recurrent cardiac arrhythmias. (R. 18.) The ALJ determined that Plaintiff's impairments did not meet or medically equal the criteria of those Listings. (R. 18.)

### ii. Step four

Next, the ALJ determined that Plaintiff had "the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR [§] 404.1567(c)," finding that Plaintiff could: occasionally lift ten pounds; sit for approximately six hours; stand or walk for approximately two hours in an eight-hour day; occasionally climb ramps or stairs; never climb ladders, ropes or scaffolds; occasionally balance or stoop; never kneel, crouch or crawl; and needed to avoid concentrated exposure to dust, odors, fumes, gases and poor ventilation.  (R. 18.) Plaintiff could push or pull without limit.  (R. 18.)  As to Plaintiff's disability, the ALJ determined that, while Plaintiff's "medically determinable impairments could reasonably be expected" to cause Plaintiff's symptoms, Plaintiff's statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible."  (R. 19.)  The ALJ noted that Plaintiff's reported daily activities were "not as limited as one might expect, given her allegation of physical disability."  (R. 21.)  The ALJ observed that Plaintiff testified that she was able to commute to work, perform part-time work, work from home and occasionally take a train to work.  (R. 21.)

The ALJ concluded that the RFC was supported by the medical record, which demonstrated that Plaintiff's complaints of dizziness, weakness and fatigue caused by her heart condition were resolved after a pacemaker was implanted in Plaintiff.  (R. 20.)  The ALJ also noted that Plaintiff's hypertension was found to be stable.  (R. 20.)  The ALJ found that the record indicated that Plaintiff had a full range of motion in her right knee, had full strength in her lower extremities and generally had a normal gait.  (R. 20.)  In reaching this conclusion, the ALJ accorded "great weight" to the opinion of the non-examining medical expert, Dr. Falkove, who stated that Plaintiff could perform sedentary work with environmental limitations due to her asthma.  (R. 22.)  The ALJ found that Dr. Falkove's conclusion was consistent with the "office

visit notes, which show that all of [Plaintiff's] conditions have responded well to treatment" and with Plaintiff's reported daily activities. (R. 22.)

The ALJ accorded "some weight" to the opinion of the consultative examiner, Dr. Caiati, who opined that Plaintiff had "minimum to mild limitations for standing, walking, climbing, and lifting." (R. 22.) The ALJ found that, while Dr. Caiati's opinion was consistent with his clinical findings, Dr. Falkove's opinion merited greater weight because it accounted for Plaintiff's back impairment, asthma and heart condition. (R. 22.)

The ALJ also accorded "limited weight" to the opinion of Plaintiff's treating physician, Dr. Blacher, who opined that Plaintiff could not lift or carry any weight, could sit for only fifteen minutes at a time, could stand or walk for ten minutes at a time and for a total of one hour during an eight-hour workday, would have to take unscheduled fifteen-minute breaks every hour, and would have to be absent from work four times per month. (R. 22.) The ALJ found that because Plaintiff "had a good response" to knee injections and a pacemaker and because Plaintiff's knee and back pain had been treated conservatively, the medical evidence did not support Dr. Blacher's opinion. (R. 22.) The ALJ also found that Plaintiff's daily activities were inconsistent with Dr. Blacher's opinion. (R. 22.)

Finally, the ALJ determined that Plaintiff was capable of performing her prior relevant work as a jewelry designer, because that job did not require tasks that exceeded the RFC assessed by the ALJ. (R. 22–23.) Therefore, the ALJ determined that, from September 22, 2012 through the date of the ALJ's decision, Plaintiff had not been suffering from a "disability" as this term is defined under the SSA. (R. 23.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*, 416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 87 (2d Cir. 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citations and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be 'liberally applied'; its intent is inclusion rather than exclusion.'"

*McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008)

(alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

### b. Availability of benefits

Federal disability insurance benefits are available to individuals who are "disabled"

within the meaning of the Social Security Act. To be considered disabled under the Act, a

plaintiff must establish his or her inability "to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less

than twelve months." 42 U.S.C. §§ 423(d)(1)(A). The impairment must be of "such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and

work experience, engage in any other kind of substantial gainful work which exists in the

national economy." *Id.* §§ 423(d)(2)(A). The Commissioner has promulgated a five-step

analysis for evaluating disability claims. 20 C.F.R. §§ 404.1520. The Second Circuit has

described the steps as follows:

> The first step of this process requires the [Commissioner] to
> determine whether the claimant is presently employed. If the
> claimant is not employed, the [Commissioner] then determines
> whether the claimant has a "severe impairment" that limits her
> capacity to work. If the claimant has such an impairment, the
> [Commissioner] next considers whether the claimant has an
> impairment that is listed in Appendix 1 of the regulations. When the
> claimant has such an impairment, the [Commissioner] will find the
> claimant disabled. However, if the claimant does not have a listed
> impairment, the [Commissioner] must determine, under the fourth
> step, whether the claimant possesses the residual functional capacity
> to perform her past relevant work. Finally, if the claimant is unable
> to perform her past relevant work, the [Commissioner] determines
> whether the claimant is capable of performing any other work. If
> the claimant satisfies her burden of proving the requirements in the
> first four steps, the burden then shifts to the [Commissioner] to
> prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46

(2d Cir. 1996)); *see also Lesterhuis*, 805 F.3d at 86 n.2 (describing the "five-step sequential

evaluation for adjudication of disability claims"); *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir.

2014) (describing "the five-step, sequential evaluation process used to determine whether a

claimant is disabled" (citing 20 C.F.R. § 416.920(a)(4)(i)–(v))).

### c.  Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ's RFC

determination is supported by substantial evidence and that the ALJ correctly found that Plaintiff

was capable of performing her past relevant work.  (Comm'r Mem. 17–28.)  Plaintiff

cross-moves for judgment on the pleadings, arguing that (1) the ALJ improperly discounted the

opinion of Plaintiff's treating physician, (2) the ALJ's credibility determination is not supported

by substantial evidence, and (3) the ALJ failed to properly determine whether Plaintiff could

perform her past work.  (Pl. Mem 10–19.)

### i.  Treating physician rule

Plaintiff contends that the ALJ violated the treating physician rule by improperly

weighing the medical opinion evidence and by improperly according only limited weight to

Dr. Blacher's opinion.  (*Id.* at 10–14.)  Plaintiff further argues that the ALJ violated her duty to

develop the record by not contacting Dr. Blacher before according his opinion only some weight.

(*Id.* at 14.)  The Commissioner argues that the ALJ properly accorded limited weight to

Dr. Blacher's opinion because it was internally inconsistent and not supported by the medical

record evidence and Plaintiff's testimony.  (Comm'r Mem. 21–24.)

"[A] treating physician's statement that the claimant is disabled cannot itself be

determinative." *Micheli v. Astrue*, 501 F. App'x 26, 28 (2d Cir. 2012) (quoting *Snell v. Apfel*,

177 F.3d 128, 133 (2d Cir. 1999)); *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003)

(same).  However, a treating physician's opinion as to the "nature and severity" of a plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record."[2]  20 C.F.R. § 404.1527(c)(2); *see Lesterhuis*, 805 F.3d at 88 (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))).

An ALJ must consider a number of factors to determine how much weight to assign to a treating physician's opinion, specifically: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2) and discussing the factors).  The ALJ must set forth the reasons for the weight assigned to the treating physician's opinion.  *Halloran*, 362 F.3d at 32.  While the ALJ is not required to explicitly discuss the factors, it must be clear from the decision that the proper analysis was undertaken. *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony

---

[2]  A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]."  20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)). Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see also Halloran*, 362 F.3d at 32–33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physicians['] opinion . . . .").

### 1. The ALJ erred in discounting Dr. Blacher's opinion

Plaintiff argues the ALJ erred in according reduced weight to Dr. Blacher's October 15, 2013 opinion. (Pl. Mem. 10.) In Dr. Blacher's assessment of Plaintiff's functional capacities, he determined that Plaintiff could not lift any amount of weight, could walk only one block before having to rest, could sit for fifteen minutes at one time and stand for ten minutes at one time, could stand for a total of one hour during an eight-hour workday, would require a job that permitted her to shift positions from sitting, standing or walking, and would need to take unscheduled, fifteen-minute breaks every hour. (R. 401–02.) Dr. Blacher diagnosed Plaintiff with chronic arthritis pain, noting that she had "significant" arthritis in her left knee, and noting that her symptoms included back pain, knee pain and sciatica radiating to her left leg. (R. 401.) The ALJ discounted Dr. Blacher's opinion because he found the opinion inconsistent with: (1) the medical evidence, including Dr. Blacher's office visit notes, (2) a conservative course of treatment for Plaintiff's back and knee pain, and (3) Plaintiff's "current functioning," based on Plaintiff's testimony at the hearing before the ALJ. (R. 22.) As explained below, the Court finds that the reasons provided by the ALJ for affording "limited" weight to Dr. Blacher's opinion are inadequate, and therefore the ALJ's assessment violated the treating physician rule.

### A. Office visit notes

The ALJ found that Dr. Blacher's "office visit notes do not substantiate the severe

restrictions" in Dr. Blacher's opinion and that, more generally, "the medical evidence [does not] support" a residual functional capacity as "restrictive" as in Dr. Blacher's opinion. (R. 22.) Instead, the ALJ concluded that Dr. Blacher's notes showed that Plaintiff "had a good response to knee injections and a pacemaker." (R. 22.)

Dr. Blacher consistently diagnosed Plaintiff with knee joint pain and osteoarthritis of the knee, which diagnosis the ALJ did not consider in determining whether Dr. Blacher's treating records support his opinion as to Plaintiff's limitations and capabilities. (*See* R. 306–09, 311–12, 409–10, 438, 643.) Dr. Blacher ordered x-rays of Plaintiff's knees, (R. 311, 313), and noted surgery might be required to treat her osteoarthritis, (R. 309). The ALJ also failed to note that the x-rays of Plaintiff's knees revealed significant degenerative changes, joint space narrowing, increased sclerosis and spur formation. (R. 379, 517.)

Plaintiff's knee condition was also treated by Dr. Modi, who administered Synvisc injections for her pain. On January 22, February 19, March 13, August 20 and September 10, 2013, Plaintiff reported to Dr. Modi that the Synvisc injections helped to alleviate her knee pain. (R. 484, 499, 505, 598, 618.) However, the ALJ failed to note that Plaintiff also reported to Dr. Modi that in spite of the injections, the pain and stiffness in her knees had returned, and that she sometimes felt more pain than before. (*Id.*) Moreover, the ALJ also failed to note that Plaintiff repeatedly complained to her physical therapist that although she had received two injections within the prior year, she was still feeling chronic knee pain, rating her pain as a seven or eight on a scale of one to ten. (R. 476, 484, 486.)

Therefore, although Dr. Modi's office notes periodically indicated that Plaintiff "had a good response" to the Synvisc injections to her knees, (R. 22), the ALJ's conclusion that Dr. Blacher's opinion is inconsistent with his own notes and with the medical record is not supported

by substantial evidence because the ALJ failed to consider the evidence in the record that is consistent with Dr. Blacher's opinion. *See Selian*, 708 F.3d at 418 (finding that the ALJ violated the treating physician rule by "misconstru[ing] the record" when determining the amount of weight to assign the treating physician's opinion); *Poles v. Colvin*, No. 14-CV-6622, 2015 WL 6024400, at *4 (W.D.N.Y. Oct. 15, 2015) (holding that, where the ALJ omitted records that undermined his conclusion, the ALJ's conclusion was "improperly based on a selective citation to, and mischaracterization of, the record" and "not supported by substantial evidence" (citing *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–84 (2d Cir. 2009))); *Johnston v. Colvin*, No. 13-CV-00073, 2014 WL 1304715, at *3 (D. Conn. Mar. 31, 2014) ("In reasoning that [the treating physician's] opinion merited 'little weight,' the ALJ recounted only those aspects of the opinion that were inconsistent with the weight of the objective medical evidence, . . . [but] neglected to acknowledge objective medical evidence in the record that did support Dr. Schwarz's opinion. Failing to do so necessarily means that the ALJ's analysis of how much weight to ascribe to Dr. Schwarz's opinion was lacking."); *Arias v. Astrue*, No. 11-CV-1614, 2012 WL 6705873, at *2 (S.D.N.Y. Dec. 21, 2012) (An ALJ "may not simply ignore contradictory evidence . . . the ALJ must acknowledge the contradiction and explain why the conflicting [evidence] is being disregarded."). For these reasons, the ALJ's observation that Plaintiff responded to some treatment for her knee pain ignored the portions of Dr. Blacher's records and the other evidence that were consistent with Dr. Blacher's opinion, and does not provide an adequate reason for the reduced weight assigned to his opinion.

## B. Conservative course of treatment

The ALJ also found that Dr. Blacher's opinion was undermined by the fact that Plaintiff's knee pain and back pain were "treated conservatively." (R. 22.) The ALJ stated that "there [wa]s no indication that surgery has been recommended" in support of his finding that Plaintiff's

treatment was conservative. (R. 22.) However, Dr. Blacher noted that surgery might be required to properly treat Plaintiff's knee osteoarthritis. (R. 307, 309.) Moreover, the Second Circuit has stated that the opinion of a treating physician is not "to be discounted merely because he has recommended a conservative treatment regimen." *Burgess*, 537 F.3d at 129 (citing *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000)); *see also Holman v. Colvin*, No. 12-CV-5817, 2014 WL 941823, at *6 (S.D.N.Y. Mar. 11, 2014) (finding that the ALJ "erroneously rel[ied]" on evidence that reflected "solely conservative treatment" and the efficacy of such treatment); *Ortiz Torres v. Colvin*, 939 F. Supp. 2d 172, 183 (N.D.N.Y. 2013) (noting that an ALJ "cannot discount a treating physician's opinion because the physician has recommended a conservative treatment regimen" (citing *Burgess*, 537 F.3d at 129)). In addition, a physician's decision not to recommend surgery is not substantial evidence that a claimant is not disabled. *Shaw*, 221 F.3d at 134 (stating that the district court "improperly characterized the fact" that the treating physician did not recommend surgery "as substantial evidence that [the] plaintiff was not physically disabled").

In concluding that Plaintiff's course of treatment was "conservative," the ALJ improperly undermined an assessment that Dr. Blacher made after evaluating and treating Plaintiff over a two-year period. (R. 22, 401–03.) *See Burgess*, 537 F.3d at 129; *Shaw*, 221 F.3d at 134–35 (finding that evidence of the "intermittent nature of treatment" fell "far short of the standard for contradictory evidence required to override the weight normally assigned the treating physician's opinion"). The ALJ's reliance on her conclusion that Dr. Blacher's treatment of Plaintiff was conservative was not a proper basis to discount Dr. Blacher's opinion about Plaintiff's capacities and limitations.

### C. Plaintiff's reported functioning

The ALJ also found that Dr. Blacher's opinion was only entitled to limited weight because it was inconsistent with Plaintiff's testimony about her current functioning. (R. 22.) The ALJ noted that, although Dr. Blacher determined that Plaintiff could sit for only fifteen minutes at a time and could not lift or carry any weight, Plaintiff testified that her commute to work was one hour long[3] and that she could lift two or three pounds. Irrespective of the length of Plaintiff's commute, the ALJ erred in her conclusion that Plaintiff's report of her daily activities was sufficient evidence to justify according limited weight to Dr. Blacher's opinion.[4] The ALJ noted that Dr. Blacher found that Plaintiff could sit for only fifteen minutes at a time, while Plaintiff testified that her commute to work was forty-five minutes. (R. 67.) Similarly, although Plaintiff testified that she sat when she worked from home, (R. 39), the ALJ did not ask Plaintiff how long she would sit when she worked at home.

Because "a claimant need not be an invalid to be found disabled," Plaintiff's reports of her daily activities by themselves are not substantial evidence that she was not disabled and are insufficient to justify according Dr. Blacher's opinion limited weight. *See Balsamo*, 142 F.3d at 81–82 ("[W]hen a disabled person gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him." (citations and internal quotation marks omitted)); *see also Cabibi v. Colvin*, 50 F. Supp. 3d 213, 238 (E.D.N.Y. 2014)

---

[3] Plaintiff testified that her commute took forty-five minutes. (R. 67.)

[4] While Plaintiff's reports regarding her daily activities do not by themselves provide substantial evidence for finding her not disabled, the ALJ was correct in considering whether they supported Dr. Blacher's opinion. *See Indelicato v. Colvin*, No. 13-CV-4553, 2014 WL 674395, at *3–5 (E.D.N.Y. Feb. 21, 2014) ("[T]he ability to perform many specific daily activities does not itself mean that [the plaintiff] is not disabled. But taken together, these activities give texture both to medical diagnosis and subjective accounts, and they provide an important objective basis by which to evaluate a person's symptoms." (citing 20 C.F.R. § 416.929(a)).

("Indeed, it is well-settled that the performance of basic daily activities does not necessarily contradict allegations of disability, as people should not be penalized for enduring the pain of their disability in order to care for themselves." (first quoting *Valet v. Astrue*, No. 10-CV-3282, 2012 WL 194970, at *19 (E.D.N.Y. Jan. 23, 2012); and then collecting cases)).

By failing to consider the evidence in Dr. Blacher's treating record and in the medical record consistent with his opinion, and by selectively focusing on Plaintiff's conservative treatment and her reported functions to conclude that Dr. Blacher's opinion lacked support, the ALJ failed to provide adequate reasons supported by substantial evidence for according Dr. Blacher's opinion limited weight. This failure violates the treating physician rule and warrants remand. *See Sanders*, 506 F. App'x at 77 (holding that failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand").

### 2. The ALJ erred in failing to develop the record

Plaintiff argues that the ALJ violated her duty to develop the record after perceiving inconsistencies in Dr. Blacher's opinion and before according that opinion only limited weight. (Pl. Mem. 14.) The Commissioner does not address this argument.

The ALJ has a threshold duty to adequately develop the record before deciding the appropriate weight to afford to a treating physician's opinion.[5] *Burgess*, 537 F.3d at 129 ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record." (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999))); *Collins v. Comm'r of Soc. Sec.*, No. 11-CV-5023, 2013 WL 1193067, at *9–10 (E.D.N.Y. March

---

[5] The ALJ is "under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (summary order); *see also Johnson v. Astrue*, 811 F. Supp. 2d 618, 629 (E.D.N.Y. 2011) (first citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999); and then citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)).

22, 2013) (remanding for failure to develop the record); *Pabon v. Barnhart*, 273 F. Supp. 2d 506, 514 (S.D.N.Y. 2003) ("[T]he duty to develop a full record . . . compels the ALJ . . . to obtain from the treating source expert opinions as to the nature and severity of the claimed disability . . . . Until he satisfies this threshold requirement, the ALJ cannot even begin to discharge his duties . . . under the treating physician rule." (alterations in original) (quoting *Peed v. Sullivan*, 78 F. Supp. 1241, 1246 (E.D.N.Y. 1991))).

In *Selian v. Astrue*, the consultative examiner's opinion, on which the ALJ relied, concluded that the claimant could lift objects "of a mild degree of weight on an intermittent basis." *Selian*, 708 F.3d at 421. The Second Circuit found this opinion "remarkably vague," and, as a result, the ALJ's analysis amounted to "sheer speculation." *Id.* Given the claimant's testimony to the contrary, "[a]t a minimum, the ALJ likely should have contacted [the physician] and sought clarification of his report." *Id.* (citing 20 C.F.R. § 404.1520b(c)(1)); *McClinton v. Colvin*, No. 13-CV-8904, 2015 WL 5157029, at *23 (S.D.N.Y. Sept. 2, 2015) ("In applying [20 C.F.R. § 416.920b(c)], . . . when the information needed pertains to the treating physician's opinion, the ALJ should reach out to that treating source for clarification and additional evidence."); *Gabrielsen*, 2015 WL 4597548, at *6 ("[C]ourts in the Second Circuit have concluded, citing [40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1)], that the ALJ still has an obligation to re-contact the treating physician in some cases." (citing *Selian*, 708 F.3d at 42, and *Ashley v. Comm'r of Soc. Sec.*, No. 14-CV-40, 2014 WL 7409594, at *4 (N.D.N.Y. Dec. 30, 2014))); *see also Vazquez v. Comm'r of Soc. Sec.*, No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[T]he alteration of the regulations does not give the ALJ free rein to dismiss an inconsistency without further developing the record."); *Ashley*, 2014 WL 7409594, at *4 (finding that, despite having broad discretion to resolve conflicts, the ALJ should have

contacted and sought clarification from the treating doctor instead of finding that "[i]t was not necessary to contact either [doctor to] clarify their opinions as their treating records lack the documentation that they could point to [] support their opinions" (citing 40 C.F.R. §§ 404.1520b(c)(1), 16.920b(c)(1))); *Jimenez v. Astrue*, No. 12-CV-3477, 2013 WL 4400533, at *11 (S.D.N.Y. Aug. 14, 2013) (noting that despite the 2013 amendments, "the regulations still contemplate the ALJ recontacting treating physicians when 'the additional information needed is directly related to that source's medical opinion'" (quoting How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651–01, 10,652 (Feb. 23, 2012))).

Failing to adequately develop the record is an independent ground for vacating the ALJ's decision and remanding for further findings. *See Rosa*, 168 F.3d at 83 (finding remand "particularly appropriate" where the ALJ failed to obtain adequate information from treating physicians and potentially relevant information from other doctors); *Green v. Astrue*, No. 08-CV-8435, 2012 WL 1414294, at *14 (S.D.N.Y. Apr. 24, 2012) ("[F]ailure to develop the record adequately is an independent ground for vacating the ALJ's decision and remanding the case." (citing *Moran v. Astrue*, 569 F.3d 108, 114–15 (2d Cir. 2009))), *report and recommendation adopted*, No. 08-CV-8435, 2012 WL 3069570 (S.D.N.Y. July 26, 2012). However, even where an ALJ fails to develop the opinions of a treating physician, remand may not be required "where . . . the record contains sufficient evidence from which an ALJ can assess the petitioner's [RFC]." *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 34 (2d Cir. 2013).

Dr. Blacher's opinion stated that Plaintiff had difficulty standing, sitting, and walking for extended periods. (R. 22.) The ALJ concluded that the record, including Dr. Blacher's treatment notes, did not provide support for this opinion. (R. 22.) In rejecting Dr. Blacher's opinion as not supported by his treating records, the ALJ ignored her affirmative duty to develop the record. To

satisfy her threshold duty to develop the record, the ALJ should have followed up with Dr.

Blacher to request supporting documentation or to obtain additional explanations for his

findings. *See Lopez v. Comm'r of Soc. Sec.*, 622 F. App'x 59, 60–61 (2d Cir. 2015) (stating that

"[b]efore rejecting" the treating physician's opinion because it was not supported by the record,

the ALJ should have further developed the record by obtaining a more detailed opinion from the

treating physician (citing *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 756 (2d

Cir. 1982)); *Rosa*, 168 F.3d at 79 ("Even if the clinical findings were inadequate, it was the ALJ's

duty to seek additional information from the treating physician *sua sponte.*" (alterations omitted)

(quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998))); *Ahisar v. Comm'r of Soc. Sec.*,

No. 14-CV-4134, 2015 WL 5719710, at *12 (E.D.N.Y. Sept. 29, 2015) ("[I]f a physician's report

is believed to be insufficiently explained, lacking in support, or inconsistent with the physician's

other reports, the ALJ must seek clarification and additional information from the physician, as

needed, to fill any clear gaps before rejecting the doctor's opinion." (quoting *Correale-Englehart

v. Astrue*, 687 F. Supp. 2d 396, 428 (S.D.N.Y. 2010))); *Vazquez v. Comm'r of Soc. Sec.*,

No. 14-CV-6900, 2015 WL 4562978, at *17 (S.D.N.Y. July 21, 2015) ("[W]here a treating

physician's opinion is out of sync with the treating notes, the ALJ does not have the luxury of

terminating his inquiry at that stage in the analysis. Rather, the ALJ must further develop the

record to fill any clear gaps and resolve the inconsistency." (alteration, citation and internal

quotation marks omitted)). The ALJ's failure to develop the record before assigning Dr.

Blacher's opinion "limited weight" was error and warrants remand. *Selian*, 708 F.3d at 421;

*Jimenez*, 2013 WL 4400533, at *11.

### ii. Reliance on non-examining physician

In assessing Plaintiff's RFC, the ALJ appears to have relied primarily on the findings of

Dr. Falkove, who did not examine Plaintiff. (*See* R. 22.) After reviewing the medical record, Dr.

Falkove determined that Plaintiff was "stable from [a] cardiac standpoint," that Plaintiff had moderate limitations to standing, walking, lifting and carrying," and that Plaintiff could perform sedentary work subject to environmental limitations because of her asthma. (R. 639.) The ALJ gave "great" weight to Dr. Falkove's opinion and, in line with that opinion, determined that Plaintiff could perform sedentary work except that Plaintiff was limited to only occasionally lifting ten pounds and standing for only two hours in an eight-hour work day. (R. 18, 22.)

However, the findings of a non-examining medical advisor "do[] not constitute evidence sufficient to override the treating physician's diagnosis." *Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir. 1987)). This is because "[t]he general rule regarding the written reports of medical advisors who have not personally examined a claimant is that such reports deserve little weight in the overall evaluation of disability." *Cabibi v. Colvin*, 50 F. Supp. 3d 213, 236 (E.D.N.Y. 2014) (citing *Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990)) (explaining that an "advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal examination of the claimant" (citations omitted)); *see also Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 348 (E.D.N.Y. 2010) (finding that the report of a non-examining physician could not, standing on its own, support ALJ's RFC determination (citing *Vargas*, 898 F.2d at 296)); *Filocomo v. Chater*, 944 F. Supp. 165, 170 n.4 (E.D.N.Y. 1996) (Reliance on an RFC assessment "completed by a doctor who never physically examined Plaintiff" would be "unfounded, as the conclusions of a physician who merely reviews a medical file and performs no examination are entitled to little if any weight.").

Moreover, Dr. Falkove's use of the term "moderate" to describe Plaintiff's limitations was too vague to provide substantial evidence for the ALJ's specific functional assessments. *See Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013) ("[The consultative examiner's] opinion is

remarkably vague. What [the consultative examiner] means by 'mild degree' and 'intermittent' is left to the ALJ's sheer speculation. . . . [The consultative examiner's] opinion does not provide substantial evidence to support the ALJ's finding that [the claimant] could lift 20 pounds occasionally and 10 pounds frequently."); *Ubiles v. Astrue*, No. 11-CV-6340, 2012 WL 2572772, at *11 (W.D.N.Y. July 2, 2012) (holding that the consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights . . . was entirely too vague to serve as a proper basis for an RFC" (collecting cases)); *Hilsdorf*, 724 F. Supp. 2d at 348 (holding that the consultative examiner's "statement that [the] [p]laintiff had 'limitations of a mild degree of lifting, bending, walking, standing, and pushing and pulling on arm controls'" could not "serve as an adequate basis for determining [the] [p]laintiff's RFC" because it "did not provide enough information to allow the ALJ to make the necessary inference that [the] [p]laintiff could perform sedentary work").

The ALJ improperly relied on the vague opinion of a non-examining physician over the conclusions of Plaintiff's treating physician, Dr. Blacher, in assessing Plaintiff's RFC.

### iii. Remaining arguments

Plaintiff argues that the ALJ erred in finding that she was not credible as to the intensity, persistence and limiting effects of her impairments because the ALJ improperly weighed whether Plaintiff's testimony was consistent with the medical evidence in the record. (Pl. Mem. 16.) Plaintiff also argues that the ALJ's determination that Plaintiff could perform her past work was not supported by substantial evidence. (*Id.* at 17.) The Commissioner argues that the ALJ's credibility determination is supported by substantial evidence and that the ALJ properly relied on the vocational expert's testimony to determine that Plaintiff could perform her past work. (Comm'r Mem. 24, 27.) Because the Court remands the case for further consideration of the medical evidence and development of the record, the Court will not address Plaintiff's

arguments, as the ALJ's errors impact the Court's ability to review the ALJ's credibility determination and the ALJ's determination that Plaintiff could perform her past work.

### III.  Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied and Plaintiff's cross-motion for judgment on the pleadings is granted.  The Commissioner's decision is vacated, and this action is remanded for further administrative proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).  The Clerk of Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated:  September 29, 2016
       Brooklyn, New York